UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| KATIE F. COLE, | : | Case No. 3:11-cv-199 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED; AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and therefore unentitled to disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). (*See* Administrative Transcript ("Tr.") (Tr. 28) (ALJ's decision)).

**I.**

On April 12, 2007, Katie Cole filed applications for a period of disability, DIB, and SSI benefits. (Tr. 59-70). Plaintiff alleged that she became disabled on August 2, 2006, due to depression, reactive hypoglycemia, asthma, hypertension, anxiety, cholesterol, and arthritis in her back. (Tr. 64, 78, 93).

Plaintiff's application was denied initially and upon reconsideration. (Tr. 33, 36, 43). A hearing was held on November 16, 2009, before the ALJ. (Tr. 525). The ALJ issued his decision on November 24, 2009, finding that Plaintiff was not disabled as

defined by the Social Security Act. (Tr. 28). The ALJ determined that Plaintiff retained the ability to perform a restricted range of medium-level, unskilled work that allowed her to perform a significant number of jobs in the economy. (Tr. 16-28). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 7-9). Plaintiff then commenced this action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

Plaintiff was 58 years old at the time of the alleged onset date, was 61 years old at the time of her hearing before the ALJ, and is now 64 years old. (Doc. 9 at 2; Tr. 59). She attended school through the ninth grade and is able to read and write. (Tr. 21). Plaintiff lives alone in an apartment. (Tr. 25). Plaintiff's past relevant work experience was working as a presser at a dry-cleaning business for 22 years. (Tr. 79). Plaintiff alleged that she stopped working in August 2006 because she experienced an episode of uncontrollable crying and was subsequently psychiatrically hospitalized. (Tr. 531).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc and joint disease in the lumbar spine; and depressive disorder with features of anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525. 404.1526, 416.920(d), 416.925 and 416.926).

5.  Residual functional capacity ("RFC").[1]  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: lift up to 50 pounds occasionally and 25 pounds frequently; she must avoid climbing ropes, ladders, and scaffolds, repetitive bending or twisting at the waist, work above shoulder level, exposure to hazards and exposure to irritants; and she is limited to low stress jobs with no production quotas and to no requirement to maintain concentration on a single task for longer than 15 minutes at a time.  Therefore, she is limited to a reduced range of medium work.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on February 6, 1948.  She was 58 at the alleged onset date and classified as of "advanced age."  She is now 61 and considered to be "closely approaching retirement age" (20 CFR 404.1563 and 416.963).

8.  The claimant has a "limited" education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  The issue of transferable skills is not material to this decision since there are jobs at step five (20 CFR 404.1568 and 416.968).

10. Considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from August 2, 2006, the alleged onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

---

[1] The Agency defines RFC as the "most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1).

(Tr. 22-28).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to disability insurance benefits and supplemental security income. (Tr. 28).

On appeal, Plaintiff argues that: (1) the ALJ failed to properly consider the combined effect of all of Plaintiff's impairments; (2) the ALJ erred in finding that Plaintiff's osteoporosis and the residuals of Plaintiff's ankle fracture were not severe impairments; (3) the ALJ failed to properly assess Plaintiff's credibility; (4) the ALJ failed to properly consider the symptom of pain in crafting Plaintiff's residual functional capacity; (5) the ALJ erred in his analysis of and reliance upon the opinions of agency reviewing physicians; and (6) the ALJ's decision is not supported by substantial evidence. (Doc. 9 at 8-9). The Court will address each argument in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

-4-

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

The record reflects that:

### 1.  *Mental Health Evidence*

On August 2, 2006, Plaintiff admitted herself to Good Samaritan Hospital for inpatient psychiatric care. (Tr. 151-170). Her symptoms included persistent crying, lack of motivation, suicidal ideation, memory problems, decreased energy, decreased appetite, and anxiety. (Tr. 151, 158, 166, 252). On admission, her mood was observed to be "dark." (Tr. 151). She was diagnosed with manic depressive disorder with psychotic features, as well as with anxiety, and was assigned a Global Assessment of Functioning

("GAF") score of 30.² (Tr. 151, 259). At discharge, her diagnoses remained unchanged, but her GAF score had improved to 70. (Tr. 151).

Afterwards, Plaintiff began receiving medical care through Good Samaritan Hospital's clinic, the Drew Health Center. (Tr. 184-188, 390-427). During these visits, Plaintiff described depression, crying, difficulty leaving her home, panic attacks, and auditory hallucinations. (Tr. 186, 396, 411, 415, 438). She also reported multiple episodes of dizziness resulting in falls. (Tr. 184, 187, 396, 401, 424). Plaintiff also presented to the emergency room on August 29, 2006, for an anxiety attack marked by a racing heart. (Tr. 171-182).

On August 25, 2006, Plaintiff started receiving regular mental treatment through DayMont Behavioral Health Care. (Tr. 199). This treatment continued through Plaintiff's hearing. (Tr. 462). At her initial assessment, Plaintiff was diagnosed with a major depressive disorder recurrent with severe psychotic features. (Tr. 208). Her symptoms included crying spells, suicidal thoughts, feelings of worthlessness, loss of appetite, sleeplessness, auditory hallucinations, and feelings of anxiety about three times per week. (Tr. 200, 204, 207). A psychiatric evaluation on December 17, 2007, resulted in the same diagnosis as Plaintiff's initial assessment; Plaintiff was assigned a GAF score

---

² A GAF score reflects a clinician's judgment of an individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32-33 (4th ed. 2005) ("DSM IV"). A GAF score of 21 to 30 indicates behavior considerably influenced by delusions or hallucinations, serious impairment in communication or judgment, or an inability to function in almost all areas. *Id.*

of 50.[3] (Tr. 369-372). An assessment update from March 3, 2009, recounted similar severe symptoms and noted no change in Plaintiff's diagnosis. (Tr. 490).

On November 20, 2006, state agency psychologist Dr. Cindy Matyi, reviewed Plaintiff's file and opined that she was "capable of routine work with only casual contact with coworkers and no contact with the general public." (Tr. 213). Dr. Matyi noted that Plaintiff had spent five days in the hospital in August 2006 for suicidal ideation, but that she had no prior history of treatment for mental health issues. (*Id.*) Dr. Matyi also thought that Plaintiff's allegations were only "partially credible." (*Id.*)

On June 13, 2007, consulting psychologist Dr. Jerry Flexman evaluated Plaintiff at the request of the state agency. (Tr. 261-264). Dr. Flexman diagnosed depression, anxiety, and continuous cannabis abuse. (Tr. 263). He assigned Plaintiff a GAF score of 55, and opined that Plaintiff was not impaired in her ability to understand, remember, and carry out short, simple instructions; was mildly impaired in her ability to make simple, work-related decisions; was mildly impaired in her ability to maintain attention and concentration; was mildly impaired in her ability to interact with supervisors and co-workers; and was moderately impaired in her ability to respond appropriately to changes and work pressures in a normal work setting. (Tr. 264).

On July 3, 2007, state agency psychologist Dr. Jennifer Swain reviewed Plaintiff's file and opined that Plaintiff did not have a severe mental impairment. (Tr. 282).

---

[3] A GAF score of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 32.

Dr. Swain furthered explained:

> [Plaintiff] is no more than mildly impaired in her ability to understand, remember and carry out instructions; maintain appropriate attention and concentration for tasks and relate to others appropriately. It is noted that [Dr. Flexman] opined that stress tolerance/adaptation are moderately impaired. However, given overall evidence, including ADLs, it appears that her functioning is no more than mildly impaired in these areas. She does not suffer from a severe psychological impairment.

(Tr. 294).

On November 11, 2007, state agency psychologist Dr. Douglas Pawlarczyk reviewed Plaintiff's file and affirmed Dr. Swain's determination that Plaintiff did not have a severe mental impairment. (Tr. 386).

### 2. *Physical Health Evidence*

Plaintiff reported having asthma since October 2006, and was strongly urged to stop smoking. (Tr. 424). She does not use a breathing machine or supplemental oxygen. (Tr. 21). No treatment or hospitalization is documented. (Tr. 23).

On February 13, 2007, physicians at the Drew Heath Center x-rayed Plaintiff's lumber spine to address her complaints of "intermittent, mild to moderate low back pain." (Tr. 416-417). They diagnosed Plaintiff with degenerative disc disease in the lumber spine, noting tenderness and stiff gait/movement. (Tr. 400, 416). Thereafter, Plaintiff neither saw a specialist nor received any significant treatment for her back. (Tr. 22). On August 19, 2008, Plaintiff had another x-ray of her lumbar spine that showed multilevel

disc degeneration, a "mild" retrolisthesis,[4] and a vacuum disc sign consistent with advanced disc degeneration. (Tr. 432). However, an MRI of Plaintiff's lumbar spine taken on August 28, 2008, revealed "mild" degenerative changes at several levels and "minimum" retrolisthesis. (Tr. 428, 429). No significant treatment for Plaintiff's back or examination by a specialist is documented in the record. (Tr. 22).

On June 23, 2007, Plaintiff fractured her right ankle. (Tr. 266-267). She had it surgically repaired on July 2, 2007, by Dr. Abdolali Elmi, a surgeon at Good Samaritan Hospital. (Tr. 273-274). Following the surgery, Plaintiff was placed in inpatient care at Grafton Oaks Nursing Center. (Tr. 312-335). On September 6, 2007, Dr. Elmi noted that Plaintiff's ankle x-ray "show[ed] noticeable radiographic healing, . . . no tenderness at the fracture sight[,] but . . . some swelling around the ankle." (Tr. 304). He cleared Plaintiff to return home and advised her to "gradually wean herself off the cam walker." (*Id.*)

On September 18, 2007, pursuant to Dr. Elmi's referral, Plaintiff began physical therapy at Good Samaritan North Rehabilitation Center. (Tr. 384-385). The physical therapists initially noted that Plaintiff was having difficulty with ascending and descending stairs as well as with ambulation, but that she "demonstrate[d] good rehabilitation potential." (Tr. 385). Plaintiff was discharged from therapy on October 12, 2007, because she had reached a plateau; specifically, Plaintiff had not met her goal for increasing her ankle's range of motion. (Tr. 384). However, according to the physical

---

[4] Retrolisthesis is a "backward slippage of one vertebra onto the vertebra immediately below." *Definition of retrolisthesis in the Medical dictionary*, The Free Dictionary, http://medical-dictionary.thefreedictionary.com/retrolisthesis (last visited March 6, 2012).

therapists, Plaintiff had "mostly met [her] goal" for decreasing her pain to a low pain level of two; in fact, Plaintiff's reported pain at the time of discharge was two to three on a scale of zero to ten, with ten being the worst pain. (*Id.*) The physical therapists noted that "since therapy intervention, [Plaintiff was] doing better going up and down stairs." (*Id.*) No substantial post-therapy complaints or need for any further treatment is documented in the record. (Tr. 23).

Plaintiff's record was reviewed on July 12, 2007, and on November 14, 2007, by state agency physicians Dr. Maria Congbalay and Dr. Myung Cho, respectively. (Tr. 296, 388). Dr. Congbalay determined that Plaintiff "could lift and/or carry and push and/or pull up to 50 pounds occasionally and 25 pounds frequently; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could only occasionally climb ladders/ropes/scaffolds; could frequently stoop and crouch; and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation." (Tr. 296-303; Doc. 11 at 3). According to Dr. Congbalay, "[Plaintiff's] allegations of [physical] limitations d[id] not correlate with the overall MER in file. Her allegations of [physical] limitations c[ould] be considered partially credible."[5] (Tr. 301). Dr. Cho affirmed Dr. Congbalay's assessment of Plaintiff's physical RFC, and noted that Plaintiff's "right ankle fracture [was] healing well" and that her impairment would not last at least twelve continuous months. (Tr. 388).

---

[5] State agency psychologist Dr. Cindy Matyi also found that Plaintiff's allegations concerning mental health limitations were only "partially credible." (Tr. 213).

On January 20, 2009, Plaintiff underwent bone densitometry testing and was diagnosed with osteoporosis. (Tr. 457). The testing revealed that Plaintiff is at "a severe risk of femoral neck fracture[6] with a medium risk of spinal fracture." *Id.* Plaintiff has not had either type of fracture. (Tr. 23).

In May 2009, Plaintiff was referred to a rheumatologist to address her complaints of joint pain in her hands, knees, hips, and left ankle. (Tr. 497). The rheumatologist noted some evidence of synovitis[7] in her hands and ordered tests due to possible inflammatory arthritis. (Tr. 499). However, no follow-up is documented. (Tr. 23). Also, Plaintiff indicated that Tylenol for arthritis helped alleviate her pain. (Tr. 497).

At her hearing before the ALJ, Plaintiff testified that she thought her right ankle healed correctly, but added that it would "swell real bad" if she walked a lot or stood on it "for any length of time." (Tr. 534). Plaintiff stated that she had back pain for several years, and that her back would become "real stiff" if she sat or stood for too long. (Tr. 538). She rated her back pain as a seven on a scale of one to ten, with ten being the worst pain. (*Id.*) Plaintiff acknowledged that medication helped her pain. (Tr. 539). Plaintiff thought that she could walk about two blocks before getting tired and feeling her back ache. (Tr. 540). She also believed that she could stand for about ten minutes at a time,

---

[6] "A femoral neck fracture is a hip fracture in which the neck of the thigh bone (femur) is partially or completely broken." *Fracture Femoral Neck Definition*, MD Guidelines, http://www.mdguidelines.com/fracture-femoral-neck/definition (last visited March 6, 2012).

[7] Synovitis is the "inflammation of the synovial membrane, the lining of the joint." *Synovitis definition*, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=5688 (last visited March 8, 2012).

and sit for about thirty minutes. (*Id.*) Plaintiff estimated that she could lift, at most, ten pounds, and could climb only three or four stairs. (Tr. 541). Additionally, Plaintiff testified that she did dishes, swept, mopped, vacuumed, shopped, visited friends and relatives, read, watched television, exercised a little, and took a Greyhound bus trip to Louisiana earlier in the year. (Tr. 542-545).

**B.**

First, Plaintiff claims that the ALJ did "not adequately account for the combined effects of all her impairments" in concluding "that Plaintiff [could] perform a reduced range of medium work" because the ALJ "focused on a single physical impairment" in reaching his conclusion. (Doc. 9 at 10-11).[8]

In this case, despite Plaintiff's contention otherwise, it is apparent that the ALJ considered the combined effect of Plaintiff's impairments.[9] The ALJ discussed every impairment advanced by Plaintiff as a basis for disability, referred to Plaintiff's impairments as a whole several times, explained that Plaintiff did not have an impairment or "combination of impairments" that met or equaled a listing, and specifically stated that he "considered all symptoms" in making his finding that Plaintiff had a RFC "to

---

[8] Plaintiff claims that the ALJ failed to properly consider the combined effect of "not only [her] degenerative disc disease [in the lumbar spine] and depression, but also . . . [her] arthritis, a 2007 right ankle fracture, asthma, hypertension, [and] . . . osteoporosis." (Doc. 9 at 10). Plaintiff further claims that the ALJ focused "only [on] Plaintiff's lumbar spine problems." (*Id.*).

[9] A district court can conclude that an ALJ considered a plaintiff's impairments in combination where the decision itself suggests the ALJ did so. *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 591 (6th Cir. 1987).

[perform] a reduced range of medium work." (Tr. 21-26).[10]

Further, the ALJ took into account all of Plaintiff's physical and mental impairments as evidenced by Plaintiff's RFC assessment that included not only postural and environmental restrictions, but also restrictions on the amount of stress she could be subjected to and the amount of concentration she could be required to maintain. (Tr. 25).[11]

### C.

Second, Plaintiff claims that the ALJ erred in finding that her osteoporosis and ankle fracture were not severe impairments. (Doc. 9 at 11).

However, Plaintiff's argument is legally irrelevant because the ALJ found that she had other severe impairments at step two of the sequential process and proceeded to step three in assessing her RFC. (Tr. 22-25). See *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) ("The ALJ specifically found that [some of] Anthony's [impairments] . . . qualified as severe impairments. . . . Anthony therefore cleared step two of the sequential analysis. The fact that some of Anthony's impairments were not deemed to be severe at step two is therefore legally irrelevant.").

---

[10] "An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments[.]'" *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990). Here, in this case, the ALJ specifically refers to a "combination of impairments."

[11] As to her physical impairments, the ALJ expressly considered Plaintiff's shoulder pain, osteoporosis, arthritis, and hypertension by restricting the level of lifting to a medium level, as well as including height and hazard restrictions in the RFC assessment. (Tr. 23-24, 26). Also, the ALJ expressly considered her asthma by including a restriction of no exposure to irritants despite her continued smoking. (Tr. 23). And as to her mental impairments, per the ALJ's express consideration of them, Plaintiff "is limited to low stress jobs with no production quotas and to no requirement to maintain concentration on a single task for longer than 15 minutes at a time." (Tr. 25).

Once any one impairment is found to be severe, the ALJ must consider both severe and non-severe impairments in the subsequent steps. *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). Here, because the ALJ found that Plaintiff had some severe impairments at step two of the sequential process, and then considered both her severe and non-severe impairments in the remaining steps of the sequential analysis, it is legally irrelevant that her other impairments were determined to be not severe. (Tr. 22-23).[12] Thus, Plaintiff's claim that the ALJ erred is without merit.

**D.**

Third, Plaintiff claims that the ALJ failed to properly assess her credibility and consider her allegations of pain in crafting her RFC assessment.[13] (Doc. 9 at 13-15).

While reviewing the ALJ's decision, it is important to note that this Court must accord great deference to the ALJ's credibility determinations, as the ALJ had the opportunity to observe the claimant's demeanor during the hearing. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The regulations set forth factors that the ALJ should consider in assessing credibility, including: the claimant's daily activities; the

---

[12] The ALJ found that Plaintiff's degenerative disc and joint disease in the lumbar spine, and her depressive disorder with features of anxiety, qualified as severe impairments. (Tr. 22). And as to non-severe impairments, the ALJ fully considered the evidence related to Plaintiff's osteoporosis and ankle fracture, and confirmed that the restrictions in the residual functional capacity assessment were broad enough to accommodate any limitations these conditions imposed. (Tr. 23).

[13] Plaintiff's third and fourth statements of error are similar in nature and therefore the Court will analyze these arguments simultaneously.

location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment or measures, other than medication, taken to relieve pain. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi); 416.929(c)(3)(i)-(vi).

Plaintiff claims that in defining her RFC assessment, the ALJ failed to provide "good specific reasons" for finding that she was not entirely credible in her allegations of disabling pain. (Doc. 9 at 13; Doc. 13 at 2). According to Plaintiff, "the evidence . . . is overwhelming" that she "experiences pain that [] preclude[s] [her from] standing for six or more hours per day and lifting twenty five pounds frequently and up to fifty pounds occasionally." (Doc. 9 at 15).

However, the ALJ provided several valid reasons for not finding Plaintiff fully credible. As the ALJ explained, he found that Plaintiff's "statements concerning the intensity, duration, and limiting effects of [her] impairments [were] not entirely credible" because "the objective evidence, including [the] depth of [medical] treatment [for Plaintiff's impairments was] not supportive of serious findings consistent with disability." (Tr. 26). Specifically, "there [was] no [medical] evidence to support [a] *severe* physical impairment except for [her] back (and even those MRI findings were consistently described as 'mild')." (*Id.*) (emphasis added). Moreover, Plaintiff's "daily activities . . . [did] not indicate any serious limitations with regard to functioning . . . physically." (*Id.*) Further, "there [was] no evidence of adverse side effects to medication or other treatment

that would warrant any further restriction to the RFC." (*Id.*) Finally, "[t]here are no medical opinions, treating or otherwise, to the effect that the [Plaintiff] is disabled." (Tr. 26).[14] Therefore, the Court finds that the ALJ's credibility determination and RFC assessment are supported by substantial evidence.

### E.

Finally, Plaintiff claims that the ALJ erred in his analysis of and reliance upon the opinions of the state agency reviewing physicians with respect to her physical limitations.[15] (Doc. 13 at 4). Specifically, Plaintiff claims that the ALJ failed to evaluate Dr. Congbalay's and Dr. Cho's opinions concerning Plaintiff's physical RFC under the

---

[14] As the ALJ explained, "There is no evidence of serious . . . [physical] impairment[s] or clinical signs or symptoms affecting ability to sit, stand, or walk and, accordingly, no objective basis for a sit/stand option. The [Plaintiff] has yet to even see an orthopedic specialist. There is no evidence of nerve compression or neurological deficits, abnormal gait, etc. There is no evidence of any significant treatment long-term for back pain complaints (complaints were few in the early record, none in the middle of the record, and only surfaced again in mid to late 2008). Walking was one of her primary means of transportation per her reports in much of the record, and there is no evidence of any acute back episode requiring substantial treatment." (Tr. 26). Plaintiff "has [also] not seen a specialist for the back." (Tr. 22).

Additionally, "[t]here is no evidence that the osteoporosis [has severely affected Plaintiff's ability to work or] is severe in terms of work functioning (height and hazards restrictions are included in the RFC as well as no more than medium lifting)." (Tr. 23).

Further, with respect to Plaintiff's alleged asthma, "[t]here is no evidence of serious episodes of asthma, emergency room visits, hospitalization, steroid treatment, supplemental oxygen, etc. A restriction of no exposure to irritants was added to the RFC despite her continued smoking." (Tr. 23).

[15] With respect to the opinion related to her mental limitations, Plaintiff does not dispute Defendant's contention that the ALJ reasonably weighed the opinion of Dr. Matyi, the state agency reviewing psychologist. (Doc. 13 at 4).

-16-

factors of "supportability and consistency," or explain the weight he gave to Dr. Congbalay's and Dr. Cho's opinions. (Doc. 13 at 4; Doc. 9 at 17).

The regulations make clear that "the opinions of non-examining state agency medical consultants have some value and can . . . be given significant weight. This occurs because the Commissioner views these non-examining sources 'as highly qualified physicians . . . who are experts in the evaluation of the medical issues in disability claims under the [Social Security Act].'" *Burnett v. Comm'r of Soc. Sec.*, No. 1:07cv843, 2009 U.S. Dist. LEXIS 129285, at *24 (S.D. Ohio Mar. 30, 2009). An ALJ must consider several factors when weighing the opinions of non-examining state agency medical consultants, such as "the supportability of the opinion in the evidence[,] . . . the consistency of the opinion with the record as a whole, . . . [and] the specialization of the State agency medical . . . consultant." *Id.* Additionally, "[w]here . . . the medical evidence conflicts [with a plaintiff's complaints of the existence and severity of pain], and there is substantial evidence [not] supporting . . . a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. . . . In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above." *Id.*

Contrary to Plaintiff's contentions, the ALJ provided sufficient information to satisfy the regulations.[16] First, the ALJ specifically stated that the physical restrictions

---

[16] Although the ALJ did not use the exact terms "supportability and consistency," the substance of his decision adequately addresses these factors.

were based on the "BDD assessment" and cited to Dr. Congbalay's and Dr. Cho's assessments in the record, making it clear that he gave the state agency physicians' opinions significant weight. (Tr. 26).

Next, although Dr. Congbalay and Dr. Cho opined that Plaintiff was capable of occasionally climbing ladders, ropes, or scaffolds, and frequently stooping and crouching, the ALJ further restricted Plaintiff's physical capacity by indicating that "she must avoid climbing ropes, ladders, and scaffolds, [and avoid] repetitive bending or twisting at the waist." (Tr. 25, 296). This implicitly shows that the ALJ reasonably weighed Dr. Congbalay's and Dr. Cho's opinions of Plaintiff's RFC with the evidence in the record. Additionally, the ALJ's explanation that "after the right ankle injury . . . [Dr. Congbalay's] assessment was reviewed [again] . . . and affirmed by another [state agency] physician" further supports that the ALJ evaluated the state agency physicians' opinions for supportability and consistency. (Tr. 26).

Finally, the ALJ did a thorough analysis of all the evidence, finding that there were "no medical opinions [from] treating [or examining physicians indicating] that the [Plaintiff was] disabled," and no evidence from a similarly qualified medical source to dispute Dr. Congbalay's and Dr. Cho's assessments of Plaintiff's RFC. (Tr. 26). Thus, the record makes clear that affording significant weight to the state agency physicians' opinions was proper.

## III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Katie Cole was not entitled to disability insurance benefits or supplemental security income, is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED.**

Date:  April 3, 2012                               *s/ Timothy S. Black*
                                                   Timothy S. Black
                                                   United States District Judge